FILED
2014 Mar-31  AM 09:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **VERA KELLY, O/B/O U.L.F.C.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Claimant**, | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:12-cv-3604-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| | ) | |
| **Defendant**. | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On October 5, 2009, the claimant's mother, Vera Kelly, applied for supplemental security income on behalf of the claimant, a child under the age of eighteen, under Titles XVI of the Social Security Act, alleging disability commencing on October 5, 2009. (R. 68, 117-19). The Commissioner denied these claims initially on January 4, 2010. (R. 68-74).

The claimant timely filed a request for a hearing before an Administrative Law Judge, and the ALJ held the hearing on March 5, 2010. (R. 75). In an opinion dated March 22, 2011, the ALJ found that the claimant was ineligible for supplement security income benefits. (R. 21-34). The Appeals Council subsequently denied the claimant's request for review on August 17, 2012, and the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-5). As the claimant has exhausted her administrative remedies, this court

1

has jurisdiction pursuant to 42 U.S.C. §§ 1383(c)(3).

For the following reasons, the court reverses and remands the decision of the Commissioner.

## II. ISSUES PRESENTED

Whether the ALJ failed to give the opinion of the claimant's treating psychiatrist, Dr. Elrefai, proper weight, when the ALJ gave Dr. Elrefai's opinion little weight, but gave substantial weight to the opinion of the consultative psychiatrist, Dr. Estock, dated two months *before* Dr. Elrefai began treating the claimant.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. But this court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, are "opinions on issues reserved to the Commissioner because they are administrative findings that

2

are dispositive of a case; i.e, that would direct the determination or decision of disability." 20

C.F.R. § 416.927(d). Whether the claimant meets the listing and is qualified for Social Security

disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew,

reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v.*

*Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the

ALJ about the significance of certain facts, the court has no power to reverse that finding as long

as substantial evidence in the record supports the finding.

This court must "scrutinize the record in its entirety to determine the reasonableness of

the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must look

not only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take into account evidence that detracts from the evidence on which the

ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The Social Security Administration has established a three-step sequential evaluation

process to determine if an individual under the age of 18 is disabled.  20 C.F.R. § 416.924(a).  At

step one, the ALJ must determine if the child is engaged in substantial gainful activity.  If the

child is not engaged in substantial gainful activity, the ALJ then determines whether the child

suffers from a severe impairment or combination of impairments that cause more than minimal

functional limitations.  *Id*. at § 416.924(a) & (c).  If the child suffers from a severe impairment or

combination of impairments that has lasted or is expected to continue for a continuous period of

at least 12 months, then the ALJ must determine whether the child's impairments meet,

medically equal, or functionally equal an impairment listed under Appendix I to Subpart P of Part

404. *Id*. at § 416.924(a).

Functional equivalence is dependent on the child's impairments or combination of impairments resulting in marked limitations in two broad categories of functioning or extreme limitation in one broad category of functioning. 20 C.F.R. § 416.926a(a). A "marked" limitation is one that is "more than moderate" but "less than extreme." Id. at § 416.926a(e)(2)(I). The Regulations list six broad areas of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (4) caring for yourself; and (6) health and physical well-being. *Id*. at § 416.926a(b)(1)(i-vi).

For attending and completing tasks, the ALJ should consider the claimant's "ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance." *Id*. at § 416.926a(h)(1)(i)-(ii). The ALJ should also determine the claimant's ability to "look ahead and predict the possible outcomes of [her] actions before [she] acts." *Id*. As part of determining the claimant's ability to attend and complete tasks, the ALJ should consider whether the claimant is "unduly distracted by [her] peers or unduly distracting to them in a school or work setting." *Id*. The ALJ should determine the frequency at which the claimant interrupts others. *Id*. at § 416.926a(h)(3)(iii).

For the domain of "caring for yourself," the ALJ should consider a claimant's ability to show "consistent judgment about the consequences of caring for [herself]," and a claimant's ability to employ "effective coping strategies . . . to identify and regulate [her] feelings, thoughts, urges, and intentions." *Id*. § 416.926a(k)(1)(i)-(iv). In determining whether the claimant has a marked limitation in this domain, the ALJ should consider whether the claimant follows safety

4

rules;  whether she responds to her "circumstances in safe and appropriate ways"; and whether

she makes "decisions that do not endanger [herself] . . . ."  *Id*.  The ALJ should determine if her

impairment results in the claimant "engag[ing] in self-injurious behavior (e.g., suicidal thoughts

or actions . . .), or ignor[ing] safety rules."  Id. § 416.926a(k)(3)(iv).

Regarding an ALJ's discrediting of a treating psychiatrist, the ALJ must state with

particularity the weight given different medical opinions and the reasons therefor, and the failure

to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also*

*MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  Absent a showing of good cause to

the contrary, the ALJ must accord substantial or considerable weight to the opinions of treating

physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). The ALJ must credit the

opinions of treating physicians over those of consulting physicians unless good cause exists for

treating the opinions differently. *Lewis v. Callahan*, 125 F.3d 1436, 1440-41 (11th Cir. 1997). An

ALJ must give more weight to a treating physician because this source is "likely to be the

medical professional most able to provide a detailed, longitudinal picture of [the claimant's]

medical impairment(s) and may bring a unique perspective to the medical evidence that cannot

be obtained from the objective medical findings alone or from reports of individual

examinations, such as consultative examinations . . . ."  20 C.F.R. § 404.1527(c)(2).  Generally,

the longer a treating source has treated the claimant, the more weight an ALJ should give that

source's opinion.  Id. at § 404.1527(c)(2)(i).

The ALJ may discount a treating physician's report when it is not accompanied by

objective medical evidence or is wholly conclusory. *Crawford v. Commissioner*, 363 F.3d at

1159. Where the ALJ articulated specific reasons for failing to give the opinion of a treating

physician controlling weight but those reasons are not supported by substantial evidence, the ALJ commits reversible error. *Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir. 2005).

## V. FACTS

The claimant was a fourteen-year-old female at the time of the administrative hearing and was in the eighth grade.  (R. 24, 50).  The claimant alleges disability beginning October 5, 2009 because of attention deficit hyperactivity disorder (ADHD); oppositional defiant disorder (ODD); schizophrenia with psychosis; and obesity.

*Mental Limitations*

On April 26, 2004, the claimant's pediatrician, Dr. Susanne S. Matthews, diagnosed the claimant with Attention Deficit Disorder with Hyperactivity.  (R. 226). On May 2, 2007, during an annual exam with Dr. Matthews, she noted that the claimant had psychological problems, including anger, fighting, and pulling hair.  (R. 220).

During 2008 and 2009, the record contains numerous school discipline records for the following dates: September 11, 2008; November 20; 2008; January 29, 2009, August 19, 2009; September 9 & 22, 2009; October 6, 2009; November 2 & 3, 2009; and December 8, 2009.  The claimant committed numerous disciplinary infractions on these dates, including skipping  classes; showing defiance toward teachers; refusing to follow directions in class; encouraging fighting with disruptive behavior towards other students; fighting with other students; disrupting others students by repeating every word of the teacher; disrupting the class by shouting across the room; interrupting the "instructional process"; bullying another student by knocking his property to the ground and threatening him; displaying a "pattern of intimidation and threats" toward other students; kicking a broom that hit a teacher; and refusing to do work.  (R. 191-206).

On February 13, 2008, the claimant began treatment with Dr. Arnold Mindingall, a licensed psychologist with Child & Adolescent Associates, P.C. because she was experiencing difficulties academically and behaviorally.  The record shows that Dr. Mindingall treated the claimant on twenty-two occasions from February 13, 2008 through April 28, 2010.  (R. 293-306).  Although his treatment notes contained in the record are extremely difficult to decipher based on illegible handwriting, his letters to the claimant's pediatrician, Dr. Matthews, dated April 4, 2008 and November 21, 2008, reveal that his initial diagnosis of the claimant included ADHD and ODD.  He indicated that the claimant was a "candidate for medical intervention directed at her difficulties with attention, focus and impulsivity," and that she should continue family and individual counseling "focusing on her issues with oppositionality and disruptive conduct."  He also noted that he had prescribed her 18 mg of Concerta, but indicated that she may need an increase.  (R. 307-308).

The claimant's mother completed a "Function Report—Child Age 12 to 18th Birthday" on October 22, 2009 at the request of the Social Security Administration.  In the report, the claimant's mother indicated that the claimant does go to school full-time, but that "she has behavior problems and is not allowed [to] do a lot of things at school or home"; that she has limitations in understanding, carrying out, and remembering simple instructions; that she has problems making friends and getting along with others; and that she has limitations in her ability to pay attention and stick with a task, including her failure to complete homework and chores. (R. 128-135).

On November 12, 2009, the claimant's mother completed another "Function Report" for the claimant, indicating that the claimant "can't complete a sentence"; that she has poor verbal

7

communication; that she cannot spell many words; and that she takes extra classes at school to help her with her words. She also stated that the claimant goes to tutoring; has no friends and is a loner; has problems reading and understanding what she reads; has problems adding, subtracting, multiplying, and dividing numbers over 10; and has trouble with simple instructions. According to the claimant's mother, the claimant "is put out of class, cause she gives up on the lessons"; gets angry and frustrated easily; and has to be told over and over again to do something. (R. 147-155).

Dr. Dan Lowery, a licensed psychologist, performed a mental examination of the claimant on January 4, 2010 at the request of the Disability Determination Services. Dr. Lowery indicated that he based his report on information provided by the claimant and her mother and recounted what they had told him about the claimant's history, including her defiant and oppositional behavior towards her mother, siblings, teachers, and peers. He stated that he considered this information reliable. (R. 240-241).

Based on his personal evaluation of the claimant on that date, Dr. Lowery indicated that she was neatly groomed; was attentive, cooperative, and showed no signs of hyperactivity during the interview, but noted that she had taken her Concerta before the interview; demonstrated average to below average interpersonal skills; had mostly restricted affect; had a stable mood; displayed normal speech; and had mostly intact concentration. He also stated that the claimant correctly answered a simple change-making question; could perform basic math problems (i.e., 2+3, 3+4, 10-2); could count backwards from 20 to 1; could repeat five digits forward and three backwards; had normal recent and remote memory; incorrectly answered that a year has 12 weeks; and had logical, coherent thought processes with no "tangential thinking, loose

associations, confusion, or flight of ideas." (R. 241-242).

Regarding the claimant's thought content, Dr. Lowery noted that the claimant reported that she feels suicidal when angry; that she reported "hearing voices that tell her to do 'bad things' to other people and herself"; that the voices tell her to "cut herself, choke herself, and cut others with a knife"; and that she reports experiencing visual hallucinations.  He also stated that the claimant indicated that she does not trust anyone; "believes that her mother attempts to poison her food"; and is paranoid and checks to be sure the doors are locked because she hears "'people on the side of the house.'" In terms of judgment and insight, Dr. Lowery noted that the claimant has "below average insight related to her condition and future" and below average judgment.  In his prognosis section of the report, Dr. Lowery indicated that he believes that "her paranoia and impaired state of reality is mostly responsible for her defiance and oppositional behaviors."  (R. 242-243).

On January 4, 2010, Dr. Robert Estock, a consulting psychiatrist, assessed the claimant's records at the request of the Social Security Administration.  He indicated that he suspected that the claimant suffered from schizophrenia, paranoid type and ODD, but ruled out ADHD.  He found that the claimant's impairments were severe, but that she did not meet, medically equal, or functionally equal a Listing. He noted many of Dr. Lowery's findings, including that  the claimant did not initiate conversation; showed average to below average interpersonal skills; had mostly restrictive affect; had stable mood, normal speech, intact concentration and attention, and normal memory; indicated that she felt suicidal when angry and hears voices; reported that her mother "tries to poison her food"; and has below average judgment.  Dr. Estock gave significant weight to Dr. Lowery's findings  and found the sources of his information credible.  Based on his

review of all the evidence before him, Dr. Estock concluded that the claimant had a marked limitation in the area of interacting and relating to others; less than marked limitations in acquiring and using information and attending and completing tasks; and no limitations in moving about and manipulating objects, caring for herself, and health and physical well-being. (R. 245-250).

Because of the claimant's disruptive behavior in school, she attended alternative school from January 20 to February 17, 2010 for repeated incidents of fighting, showing disrespect to others, and continually disrupting the class.  The discipline note indicated that the school had previously tried methods of discipline to no avail, such as referral to the counselor, detention, referral to the Building Based Student Support Team, parent conferences, and suspensions.  (R. 187).

On March 18, 2010, Nyshetia Chapman, a licensed graduate social worker, at Western Mental Health Center, completed a "Children's Intake and Psychosocial Assessment" of the claimant at the request of Dr. Lowery.  Ms. Chapman indicated that Dr. Lowery made the referral because he "feels that the diagnosis [the claimant] received from her current psychologist [Dr. Mindingall] at Child & Adolescent Associates, P.C. is incorrect."  Ms. Chapman reported that because Dr. Lowery felt that the most appropriate diagnosis for the claimant was Paranoid Schizophrenia, he referred her to Western Mental Health Center for a psychiatric evaluation and treatment.  (R. 265).

In her assessment, Ms. Chapman reported the claimant's family history of mental illness, including the claimant's older sister who had two imaginary friends in the 11th grade and attempted suicide, and her paternal grandmother with a diagnosis of Paranoid Schizophrenia.

The claimant indicated to Ms. Chapman that she had suicidal and homicidal thoughts; that when she is angry and alone, she hears a female voice that tells her to harm herself and/or others; that the last time she was mad, the voice told her to take her mother's heart medication and kill herself; that she and her sister were arguing in the car and the voices told the claimant to "make them crash so that her sister would die"; and that she does not "follow through" with what the voices tell her to do.  Ms. Chapman also noted that the claimant likes to talk on the phone and listen to music.  Ms. Chapman indicated that she would refer the claimant to Dr. Alaa Elrefai for a psychiatric assessment. (R. 265-270).

On April 28, 2010, Dr. Elrefai began treating the claimaint for her psychiatric condition. In her initial psychiatric assessment, Dr. Elrefai recounted the claimant's history of problems in school, including over "200 suspensions since kindergarten", defiance toward teachers, and paranoia about others talking about her at school.  She also noted that the claimant reports hearing voices "when upset, sad or emotional."  Dr. Elrefai also recounted the claimant's past treatment with Dr. Mindingall and Dr. Lowery.  (R. 259).

During the assessment, Dr. Elrefai noted that the claimant "sat quietly and rocked slightly in her seat"; had minimal verbal interaction; had flat mood; reported that she hears voices that say different things to her each time that affects her perception; had goal-directed thought; was mildly inattentive; was fully oriented "except for the situation"; had fair concentration; had clinically low average intelligence; and possessed poor judgment and insight. Dr. Elrefai assessed that the claimant presented with symptoms indicative of psychosis, "most likely schizophrenia." She noted that the claimant has reported homicidal and suicidal ideations and has "chronic symptoms that interfere with her reality perception."  Dr. Elrefai assigned the claimant a GAF

score of 20; indicated that she would need treatment with the child & adolescent team at Western Mental Health until at least the age of 18; and prescribed Invega for her psychosis.  (R. 260-264).

Immediately before and after her initial assessment with Dr. Elrefai, the claimant continued to have serious issues in the school setting.  Between April 8 and May 21, 2010, she had five incidents of school discipline for "consistently screaming and talking loud in class"; using profanity in the classroom; repeated incidents of skipping classes; refusal to attend Saturday school; defiance and disrespectful behavior toward teachers; and throwing food in the lunchroom.  (R. 179-184).

On May 14, 2010, the claimant sought treatment again with Dr. Elrefai, who noted that the claimant had chronic symptoms of a psychotic illness.  Dr. Elrefai also indicated again a GAF score of 20, showing that the claimant has "some danger of hurting herself, plan & means . . . or some danger of hurting others, often violent, physical aggression without clear risk of serious injury. . . or incapable of work or friendship."  (R. 256).  In her notes, Dr. Elrefai noted that the claimant had command and commentary auditory hallucinations; persecutory delusions; irritability; regressed self-care; sleep problems; social withdrawal/dysfunction; and educational/cognitive dysfunction.  The goals established in the claimant's treatment plan included controlling hallucinations and delusions; normalizing social functioning; and controlling violence and hostility; attending weekly individual counseling sessions; family counseling monthly; and monthly medication monitoring.  (R. 255-258).

The claimant saw Dr. Elrefai again on June 2, 2010 for a one-month follow-up.  Her notes indicated that the claimant started the Invega only one week prior to this visit, and that he stressed  the importance to the claimant's mother of the claimant taking her medication correctly.

The claimant indicated no change in her condition.  (R. 254).

When the claimant visited Dr. Elrefai on July 7, 2010 for her follow-up, the claimant's mother indicated that the claimant had improved some; that she does not talk to herself; gets along better with others; was sleeping better; but still puts her hands on her ears.  (R. 253).  On August 9, 2010, Cynthia Hood, the licensed counselor social worker in Dr. Elrefai's office, indicated that the claimant was making progress toward her objectives, but that she needed continued participation in her treatment.  (R. 258).

On September 10, 2010, after almost six months of treating the claimant for her psychosis, Dr. Elrefai completed a Supplemental Questionnaire at the request of the claimant's attorney "to amplify" her medical records.  On the questionnaire, Dr. Elrefai indicated that the claimant had "marked" limitations in the following areas: ability to understand, carry out, and remember simple instructions; ability to maintain attention for extended periods of time; ability to use appropriate judgment; ability to make simple decisions; and ability to take necessary safety precautions.  She found that the claimant had "moderate" limitations in her ability to respond appropriately to supervision and peers and ability to deal with changes in a school or work routine.  In the comments section of the questionnaire, Dr. Elrefai indicated that the claimant is "psychotic, experience[s] auditory/visual hallucinations and paranoid ideas" and is "chronically mentally ill."  (R. 272-273).

On October 6, 2010, the claimant saw Dr. Elrefai for a follow-up.  Dr. Elrefai indicated that she was compliant with her medication but was still hearing voices telling her to do things, but was not acting on them.  She also reported to Dr. Elrefai that she has "trouble going to sleep at night."  The claimant's mother indicated that "she's not reacting like she used to" but that she

was still hearing the voices.  Dr. Elrefai increased her Invega dosage from 6mg to 9mg, although the claimant reported "slight sedation" as a side effect of the medication and prescribed 1mg of Cogentin to help with the side effects.  (R. 289).

The claimant's mother called Dr. Elrefai's office on October 12, 2014, indicating that the pharmacy needed an "override" to increase the Invega from 6mg to 9mg.  During the call, her mother noted that the claimant has "more good days than bad."

Dr. Elrefai treated the claimant again on December 1, 2010, and the claimant reported that she continued to hear voices although she had been compliant with her medication.  His notes indicate that the claimant was attending anger management classes at school and continued to take 9mg of Invega and 1mg of Cogentin.

After June 2010, when the claimant began to show slight improvement with her medications, she continued to have serious issues with her behavior at school.  The record contains no school disciplinary notices for June, July, or August of 2010 because of the summer break. However, beginning on September 1, 2010 and continuing until February 13, 2011, the record contains six disciplinary notices for "consistently blurting out and making tappy noises in class"; interrupting class with outbursts; disrupting other students; walking out of class without permission; fighting; throwing a desk and chair down; engaging in a food fight, and disrespecting staff and using profanity.  (R. 172-178).

*The ALJ Hearing*

After the ALJ denied the claimant disability benefits, the claimant timely filed a request for a hearing; the ALJ held a hearing on February 28, 2011. The claimant's mother testified first, and indicated that the claimant was in eighth grade, making D's and C's, with no special

14

education classes.  She stated that Dr. Elrefai had treated the claimant for almost a year at the time of the hearing and that the claimant sees Dr. Elrefai and the counselor monthly.  (R. 50-51).

The claimant's mother testified that the claimant's current medications do help, but that she still has delusions or hallucinations, but not as much as before the medications.  She explained that the claimant is violent toward her sister and wanting to kill her "because her friend [told] her to do so."  She stated that the claimant's "friend" does not exist, but is known by the name "Kim."  According to the claimant's mother, "Kim" has told the claimant to cut stuff up and knock down a Playstation.  Her mother indicated that the claimant had not had a bad incident in about three months, but that her misconduct had started again at school.  (R. 52-53).

When asked about her activities, the claimant's mother testified that the claimant sometimes goes to the movies, and sometimes shops with her mom.  She also stated that the claimant has to clean her room and wash dishes, but does not complete those tasks with typical reminders.  (R. 56-57, 65).

When asked about how the claimant reacts to situations, her mother indicated that she overreacts. She also stated that the claimant has difficulty maintaining friendships over time; that she does homework but that she has to stay on her to do so; that she has difficulty concentrating and gets to the point where "she's not functional, that she won't go to school, that she won't do anything"; that she still has behavior problems in school; and that despite the medication, the claimant is still having "pretty severe problems."  (R. 54-56).

The claimant also testified at the hearing and indicated that she does not like most of her teachers because they are mean, and she feels "a bad vibe with them."  She stated that her teachers just do not like her.   She also testified that she does not have many friends because she

does not trust any of them and worries about "backstabbing."  She said that when she gets really angry, she fights at school. (R. 59-60).

She indicated that she talks to a friend named "Kim" that no one else can see, and that Kim is with her "all the time."  She described Kim as "really short," overweight, with long, curly hair and "brown skinned."  The claimant testified that Kim talks to her and tells her to do things; she stated that "the last time [she] could remember she told [her] to try to stab [her] sister because [they] were fighting."  When asked by her attorney if she knew that she should not do those things, the claimant responded "I try." (R. 61-62, 63-64).

She stated that she has no hobbies and that nothing makes her really happy.  She said she wanted to be a pediatrician, but that her sixth grade teacher told her that "dump people don't be pediatricians."  She testified that she takes PE every day at school.  (R. 62, 65).

*The ALJ's Decision*

On March 22, 2011, the ALJ found that the claimant was not eligible for disability benefits.  The ALJ found that under the three-part analysis for determining child disability status, the claimant had not engaged in substantial gainful activity since October 5, 2009.  The ALJ also found that the claimant suffered from the severe impairments of ADHD, ODD, psychosis not otherwise specified, and obesity.  However, he concluded that the claimant did not have an impairment or combination of impairments that meets or medically equals a listing.  (R. 21-24).

In assessing whether the claimant met a listing under §§ 112.03 or 112.11, the ALJ found that she had a marked impairment in age-appropriate social functioning, but that she did not have a marked limitation in any other category to meet the listing.  Specifically, the ALJ found that the claimant had no marked limitations in the following areas: (1) cognitive/communicative function

16

because her mother testified she had no problems seeing, hearing, or communicating and her school testing showed she was average academically; (2) personal functioning because her mother stated that she has no limitations in her ability to care for her personal needs or safety and a January 2010 consultative examination indicated she had good hygiene and neatly groomed hair; and (3) concentration, persistence, or pace because a January 2010 consultative exam noted that her "concentration and attention were mostly intact" and she could "complete serial sevens, perform basic arithmetic, and count backwards from twenty." (R. 24). As such, the ALJ concluded that the claimant's ADHD and psychosis did not meet or medially equal a listing under §§ 112.03 or 112.11.

Next, the ALJ addressed whether the claimant's severe impairments, either singly or in combination, met a listing under "paragraph B" of listing § 12.03. The ALJ found that the claimant has marked difficulties in maintaining social functioning. However, he found that the claimant only had moderate limitations regarding concentration, persistence, and pace. The ALJ explained that the claimant's mother indicates that she does not complete her homework; does not finish what she starts; and is unable to understand, carry out, and remember simple instructions. However ALJ stated that "clinically, the claimant's concentration and attention are mostly intact and her memory is normal." (R. 25). The ALJ also found that the claimant had mild limitations in activities of daily living because she attends school full-time; reports no difficulty in taking personal care of herself; attends an after-school program each day; enjoys watching television, talking on phone, playing video games, and going to the movies; and is responsible for cleaning her room and washing dishes. The ALJ indicated that the record contained no evidence of any episodes of decompensation of extended duration. As such, he

concluded the claimant did not meet a listing under "paragraph B" because she did not have two

marked limitations or one marked and repeated episodes of decompensation of extended

durations.  (R. 25).

The ALJ then assessed that the claimant did not meet a listing under "paragraph C"

because the record contains no evidence of decompensation, or that a minimal increase in mental

demands or change in environment would cause episodes of decompensation.  The ALJ noted

that the claimant attends school full-time and has changed schools with no decompensation. (R.

25).

After finding that the claimant did not have a severe impairment that meets or medically

equals a listing, he next discussed whether her impairments functionally equal a listing.  The ALJ

discussed all six domains of limitations and found that the claimant had a marked limitation only

in the domain of interacting and relating with others, and, thus, did not functionally meet a

listing.  (R. 31, 33).  In discussing the other five domains, the ALJ found that the claimant had a

less than marked limitation in acquiring and using information because she attends school full-

time with some behavioral difficulties; has average scores in standardized testing; can read and

understand stories; can do basic math; make correct change; can tell time; can count backwards

from twenty; and can spell "world" backwards.  (R. 29).

In the attending and completing tasks domain, the ALJ found that the claimant had a less

than marked limitation in this category.  The ALJ did acknowledge that the claimant's mother

reported that the claimant does not complete household chores and does not complete homework.

However, the ALJ pointed to Dr. Lowery's consultative exam notes indicating that the claimant

had mostly intact concentration and attention; logical and coherent thought process; and showed

18

no signs of tangential thinking, loose associations, confusion, or flight of ideas.  The ALJ also noted Dr. Elrefai's evaluation indicating that the claimant had fair concentration and was only "mildly inattentive."  (R. 30).

The ALJ concluded that the claimant had no limitation in the moving about and manipulating objects domain.  The ALJ reasoned that the record contained no evidence that the claimant has any limitation in this area and noted that she participates in physical education and band.  (R. 32).

In the caring for yourself domain, the ALJ found that the claimant has no limitation in this area and pointed to the October 2009 Function Report in which the claimant's mother stated that she "is not limited in her ability to care for her personal needs or her safety."  The ALJ also noted medical providers' notes that indicate the claimant was "neatly groomed with good hygiene."  (R. 33).

In the last domain, the ALJ found that the claimant has no limitation in health and physical well-being, explaining that, although the claimant is "mildly obese," no evidence exists in the record to show her obesity limits her health or well-being.  The ALJ also indicated that the record "contains no evidence that the claimant's mental impairments cause difficulties in this area."  (R. 33).

The ALJ also stated that the "evidence of record partially supports" the claimant's allegations that her impairments cause symptoms "such as difficulty getting along with others, hallucinations, paranoia, depressed mood, and fatigue."  The ALJ discussed at length the medical evidence in the record indicating that the claimant's symptoms have improved, including Dr. Lowery's January 2010 assessment indicating the claimant showed no signs of hyperactivity,

stable mood, and logical thought process; Dr. Elrafai's statements that the claimant "was getting along better with others," was not talking to herself anymore, and was sleeping better; and her mother's statements to Dr. Elrefai and testimony at the hearing that "medications have significantly improved the claimant's behavior." The ALJ also noted that the claimant has received only conservative treatment for her impairments, including medication, anger management group counseling, and individual counseling, but no hospitalization. (R. 27).

The ALJ discussed her impressions of the claimant at the hearing and indicated that she "did not appear to be psychotic at the hearing. In fact, although she appeared somewhat withdrawn and sullen, [she] answered all questions in a clear, logical, and coherent manner. As such, she did not appear to be markedly different than a typical fourteen year-old-child." (R. 28).

In assessing the weight to give the medical opinions in the record, the ALJ gave "significant weight" to Dr. Estock's January 2010 consultative mental assessment of the claimant indicting that the claimant had marked limitations in interacting and relating to others, but no limitations in any other area. The ALJ explained that Dr. Estock's findings "are well supported by the record as a whole, particularly in light of the claimant's apparent improvement on medications." (R. 28).

The ALJ gave "little weight" to the treating psychiatrist Dr. Elrefai's opinion that the claimant has marked limitations in areas such as using appropriate judgment, understanding and carrying out simple instructions, and taking necessary safety precautions. The ALJ stated that Dr. Elrefai's opinion is not support by the objective medical evidence, particularly her own notes that indicate that the claimant "significantly improved" with the use of medications. The ALJ indicated that Dr. Elrefai's September 2010 questionnaire "is more appropriate to an adult

disability case, as it does not give an opinion as to the claimant's limitations in the six functional

equivalence domains."  (R. 28).

As such, the ALJ concluded that the claimant was not disabled under § 1614(a)(3)(C) of

the Social Security Act.

## VI. DISCUSSION

*Substantial evidence does not support the ALJ's giving the claimant's treating
psychiatrist Dr. Elrefai's opinion little weight, but assessing the consultative psychiatrist Dr.
Estock's opinion substantial weight, when his assessment is dated two months before Dr. Elrefai
began treating the claimant.*

The claimant argues that the ALJ improperly gave the treating psychiatrist Dr. Elrefai's

opinion regarding claimant's mental limitations "little weight," while giving the consulting

psychiatrist Dr. Estock's opinion "substantial weight."  The court agrees and finds that

substantial evidence does not support the ALJ's discrediting of the treating psychiatrist Dr.

Elrefai's assessment of the claimant's mental limitations.

The ALJ must give the opinions of treating physicians greater weight than those of

consulting physicians unless good cause exists for treating the opinions differently. *Lewis v.

Callahan*, 125 F.3d 1436, 1440-41 (11th Cir. 1997). An ALJ must give more weight to a treating

physician because this source is "likely to be the medical professional most able to provide a

detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique

perspective to the medical evidence that cannot be obtained from the objective medical findings

alone or from reports of individual examinations, such as consultative examinations . . . ."  20

C.F.R. § 404.1527(c)(2).  The ALJ must consider the length of treatment, and the longer a

treating source has treated the claimant, the more weight an ALJ should give that source's

opinion.  Id. at § 404.1527(c)(2)(i).

The ALJ can discredit a treating physician's report when it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford v. Commissioner*, 363 F.3d at 1159. Where the ALJ articulated reasons to discredit a treating doctor's opinion are unsupported by substantial evidence, the ALJ commits  reversible error. *Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th  Cir. 2005).

The ALJ gave "little weight" to Dr. Elrefai's September 10, 2010 assessment, given after almost six months of treating the claimant.  Her assessment stated that the claimant has "marked" limitations in the following areas: ability to understand, carry out, and remember simple instructions; ability to maintain attention for extended periods of time; ability to use appropriate judgment; ability to make simple decisions; and ability to take necessary safety precautions.  In giving Dr. Elrefai's opinion "little weight," the ALJ articulated two reasons for doing so: (1) Dr. Elrefai's opinion is not supported by the objective medical evidence in the record, particularly her own notes that indicate that the claimant has "significantly improved"; and (2) the questionnaire form that Dr. Elrefai used for her assessment "is more appropriate to an adult disability case, as it does not give an opinion as to the claimant's limitations in the six functional equivalence domains."  (R. 28).

As to the ALJ's first reason, the ALJ stated that Dr. Elrefai's assessment of the claimant's limitations conflicts with the objective medical evidence in the record; but, the only conflict the ALJ cited was that Dr. Elrefai's assessment conflicts with her own notes that the claimant's condition had "significantly improved."  Although the court agrees that the claimant's chronic psychotic condition had improved somewhat while taking an anti-psychotic medication, the ALJ

failed to discuss or apparently take into account the claimant's continued hallucinations and hearing of auditory voices despite the slight improvement and her continued problems at school. The ALJ failed to note or discuss anywhere in his opinion Dr. Elrefai's notes of October 6, 2010, indicating that, although the claimant was compliant taking her medication, she was still hearing voices telling her to do things, but was not acting on them.  (R. 289).  Dr. Elrefai's notes on that same date also indicate that the claimant continued to have problems sleeping at night, although she had reported earlier in July 2010 that her sleep had improved on the medication.  (R. 258, 289).  Also, the doctor increased the claimant's Invega dosage from 6mg to 9mg on October 6, 2010 because she was still hearing voices.  Moreover, the ALJ failed to mention the claimant's December 1, 2010 follow-up with Dr. Elrefai, where the claimant reported that she continued to hear voices, even with the increase to 9mg of Invega.

Despite her slight improvement and increased medication, the claimant also continued to have serious issues with her behavior at school even while taking her anti-psychotic medication. The ALJ statement that the claimant has had "some" behavior problems at school is certainly an understatement, to say the least.  (R. 29).  Dr. Elrefai's April 28, 2010 notes indicated that the claimant has had an *extensive* history of problems in school, including over "200 suspensions since kindergarten."  (R. 259).  Also, from September 1, 2010 through February 13, 2011, even after Dr. Elferai's assessment, the record contains six discipline notices for the claimant's defiant behavior, such as disruptive outbursts in class; fighting; throwing a desk and chair down; disrespecting teachers and staff; and engaging in a food fight.  (R. 172-178).  These poor choices at school certainly indicate the claimant's continued lack of good judgment about how to handle situations even on her medication.

23

Additionally, the claimant's mother, whom the doctors and ALJ deemed credible, testified at the hearing on February 28, 2011 that, although the medications do help some, the claimant continues to have delusions and hallucinations, although not as much as before the medication.  The claimant's mother did indicate the last "bad" episode where the claimant acted on what her imaginary friend "Kim" told her to do was about three months before the hearing. However, she also indicated that the bad episodes had started again at school when she indicated "but it started again at school"—a statement certainly corroborated by the school records discussed above.  (R. 52-53).  According to her mother's testimony at the hearing, despite the claimant's medications, she is still having "pretty severe problems."  (R. 56).  Yet, the ALJ referred to the claimant's mother as indicating that the claimant has substantially improved, without mentioning the continued "severe problems," such as continued hallucinations and hearing of voices.

Moreover, the claimant testified at the hearing in February 2011 that she continues to hear voices and talks to her imaginary friend "Kim," who tells the claimant to do bad things. Although she did not give a specific time frame as to when, the claimant indicated that "the last time [she] could remember she told [her] to try to stab [her] sister because [they] were fighting." (R. 61-62).  Also, when asked by her attorney at the hearing if she knew that she should not do those things, the claimant indicated that "I try."  (R. 62).  Again, these statements are telling as to the claimant's continued altered perception and impaired judgment regarding reality even on her medications.

Given the facts that the claimant continued to have hallucinations, continued to hear voices that told her to do bad things, and continued to exhibit defiant behavior and poor

24

judgment at school, this court cannot accept the ALJ's decision to give Dr. Elrefai's opinion "little weight" based on the claimant's "substantial improvement," when evaluating the record as a while.

Moreover, the ALJ's only other reason for discrediting the treating psychiatrist's opinion was that the form used by Dr. Elrefai was more suited for an adult assessment, as it did not contain a specific assessment of the six functional equivalence domains. Although Dr. Elrefai's assessment of the claimant did not contain the magic language of every domain, it did include specific language that certainly would fit the "marked" limitations finding in two of the domain categories: (1) attending and completing tasks; and (2) caring for yourself. Dr. Elrefai's finding that the claimant has marked limitations in her ability to maintain attention for extended periods of time, ability to use appropriate judgment, and ability to make simple decisions would correspond to a finding of a marked limitation in the domain of attending and completing tasks. Her inability to maintain focus, use good judgment, or make simple decisions would certainly affect her ability to "filter out" distractions and remain focused on a task at a consistent level of performance, as evidenced in the attending and completing tasks domain. *See* 20 C.F.R. § 416.926a(h)(1)(i)-(iv).

Also, Dr. Elrefai's assessment that the claimant has marked limitations in her ability to use proper judgment and ability to take necessary safety precautions would equate to a marked finding in the domain of caring for yourself. For that domain, the ALJ must consider a claimant's inability to show "consistent judgment about the consequences of caring for [herself]"; inability to respond to her "circumstances in safe and appropriate ways"; and inability to make "decisions that do not endanger [herself} . . . ." *See* Id. at § 416.926a(k)(1)(i)-(iv). The

court finds that Dr. Elrefai's assessment of the claimant's marked limitations in using good judgment and taking the necessary safety precautions would show the claimant's inability to make good judgments in caring for herself and responding to events in safe and appropriate ways. Even though Dr. Elrefai did not use a specific form with the magic language of each domain, her findings of marked limitations in certain areas clearly correspond to findings of marked limitations in two of the domains. If the ALJ had given Dr. Elrefai's opinion substantial or controlling weight, such a finding of marked limitations in two domains would have been sufficient to find that the claimant met a listing.

The Commissioner in her brief argues that Dr. Elrefai's September 2010 assessment finding marked limitations in these areas was "conclusory." The court disagrees. Dr. Elrefai's findings were consistent with her medical notes and were based on her knowledge gained from almost six months at that time of continued treatment of the claimant. Dr. Elrefai, as the treating psychiatrist, had the foundation in treating the claimant to assess that she is "psychotic, experience[s] auditory/visual hallucinations and paranoid ideas" and is "chronically mentally ill." (R. 273). As the treating physician, Dr. Elrefai was in the best position to determine and assess the claimant's long term prognosis and mental limitations given her chronic psychosis. If the ALJ was unclear as to what domains Dr. Elrefai's marked findings corresponded to, the ALJ should have re-contacted Dr. Elrefai for clarification, given the fact that she was the claimant's treating psychiatrist with the most knowledge about the claimant's mental limitations.

But instead of giving Dr. Elrefai's assessment the weight it deserved or re-contacting Dr. Elrefai, the ALJ gave the consultative examiner Dr. Estock's opinion "significant weight." Dr. Estock, after only reviewing Dr. Lowery's consultative opinion and the medical evidence in the

record at that time, determined that the claimant had a marked limitation in only one area, interacting and relating to others, but *no* limitations in any other domain.  The ALJ specifically indicated that he gave Dr. Estock's findings "significant weight" because they "are well supported by the record as a whole, particularly in light of the claimant's apparent improvement on medication.'  (R. 28).  This court takes issue with the ALJ's finding that Dr. Estock's opinion is supported by the record as a whole.  At the time of Dr. Estock's opinion in January 2010, the claimant had not even begun her treatment with Dr. Elrefai or began taking Invega to help control her symptoms.  The court is baffled as to how the opinion of Dr. Estock, who did not treat or examine the claimant or have the treating psychiatrist Dr. Elrefai's notes from almost six months of treatment before him, would be entitled to considerably more weight than the psychiatrist who consistently treated the claimant, made the determination to treat the claimant's psychosis with anti-psychotic medications, monitored and had to increase the claimant's medications, and documented continued hallucinations and auditory voices, symptoms of a chronic psychosis, even after increasing the claimant's Invega from 6mg to 9mg.  Such an award of significant weight to one who merely reviewed incomplete medical records cannot be supported by substantial evidence.

Moreover, Dr. Estock himself gave Dr. Lowery's consultative assessment of the claimant dated January 4, 2010, great weight, including Dr. Lowery's findings that the claimant has below average judgment; hears voices that tell her to do bad things like "cut herself, choke herself, and cut others with a knife; and believes that her mother is trying to poison her."  The court notes that Dr. Lowery was the psychologist who pursued securing a psychiatric evaluation of the claimant in March 2010, *after* Dr. Estock's January 2010 assessment, because Dr. Lowery believed that

the claimant was Paranoid Schizophrenic and needed further assessment and treatment for her psychotic condition.  The ALJ ignored Dr. Lowery's concerns.

This court finds that substantial evidence does not support a good cause for the ALJ to discredit the treating physician Dr. Elrefai's assessment of the claimant and give the consultive assessment of Dr. Estock "significant weight."  Therefore, this court finds that the ALJ's decision must be reversed and remanded to the ALJ for further action consistent with this opinion.

## VII. CONCLUSION

For the reasons stated, this court finds that the decision of te Commissioner of Social Security denying disability benefits to the claimant is due to be REVERSED and REMANDED.

The court will enter a separate Order in conformity with this Memorandum Opinion.

DONE and ORDERS this 31st day of March, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE